IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

|  |  |  |
|---|---|---|
| LEA SMITH-JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No.: 8:03-cv-2551-T-30 |
| | ) | |
| THRIVENT FINANCIAL FOR LUTHERANS, | ) | DISPOSITIVE MOTION |
| THRIVENT INVESTMENT MANAGEMENT INC.,) | | |
| AND KENNETH E. ATWOOD, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.   INTRODUCTION

All of Plaintiff's claims arise from her former association with Thrivent as an independent contractor insurance sales agent/registered representative, selling life insurance and annuity products, primarily for Thrivent, and the termination by Thrivent of that independent contractor relationship. Plaintiff was an independent contractor, not an employee, and therefore was not covered by Title VII or the ADEA.  In the alternative, even if Plaintiff was an "employee" covered by Title VII and the ADEA, rather than an "independent contractor," her contract was terminated for a nondiscriminatory reason: she failed to follow relationship management and customer contact procedures.

Plaintiff cannot maintain her claim against Thrivent for breach of implied covenant of good faith and fair dealing, since the agreements between Thrivent and the

Plaintiff were terminable at will by either party. Plaintiff's claim of defamation based upon her Form U-5 filed with the NASD must also fail, because none of the statements in the Form U-5 were defamatory to the Plaintiff, and even if such statements were defamatory, the statements were made on an occasion subject to a qualified privilege, and the Plaintiff cannot show that Thrivent abused the privilege. Plaintiff's claim of intentional interference with advantageous business relationships against Mr. Atwood must likewise fail, because Plaintiff did not have the requisite business interest in the customers, rather, her contract with Thrivent specifically stated that all customers were the property of Thrivent, and could be assigned or reassigned at any time, at Thrivent's sole discretion. For all of these reasons, Defendants respectfully submit that summary judgment is appropriate on each and every claim Plaintiff has brought forth in this action.

## II.      STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the pleadings and depositions on file together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial, and meets that burden by showing an absence of evidence to support the non-moving party's claims. *Jeffery v. Sarasota White Sox*, 64 F.3d 590, 593 (11th Cir. 1995). The moving party may move for summary judgment on the case as a whole, or as to any claim. *Id.*

The non-movant must adduce *significant probative evidence that would be sufficient for a jury to find for the non-movant*. *LaChance v. Duffy's Draft House*, 146

F.3d 832, 835 (11th Cir. 1998)(emphasis supplied). A reviewing court generally cannot consider inadmissible hearsay evidence in opposition to a summary judgment motion. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999).

### III.    PRELIMINARY STATEMENT

Thrivent Financial for Lutherans is a not for profit fraternal benefit society providing insurance and volunteer opportunities to more than 3 million members nationwide. Thrivent offers a broad array of financial products and services, as well as charitable programs, to Lutherans, their families and their communities. Thrivent Financial for Lutherans is the product of the merger of the two former competitors, both not-for-profit fraternal benefit societies - Lutheran Brotherhood ("LB"), which was merged with and into Aid Association for Lutherans ("AAL"). The two entities agreed to merge in June 2001, and Thrivent was officially formed effective January 1, 2002.

Thrivent Financial distributes its insurance products to members, and recruits prospects into membership through independent contractor insurance agents called financial associates ("FAs"). Investment products are offered through Thrivent Investment, a member of NASD, and a wholly owned subsidiary of Thrivent Financial, through independent contractor representatives called registered representatives. Prior to the merger, LB and AAL distributed competing insurance products through independent contractor insurance agents (termed "district representatives").

Plaintiff was formerly contracted with LB as a district representative. Plaintiff accuses her immediate supervisor, Mr. Ken Atwood (formerly with AAL) of discriminating against her by treating a younger male counterpart, Chris Danford (also

formerly with AAL), more favorably than Plaintiff. It is important to keep in mind that both Atwood and Danford were formerly with AAL, into which was merged LB, the pre-merger with which Plaintiff was associated.

## IV.   PLAINTIFF WAS AN INDEPENDENT CONTRACTOR AND THUS NOT COVERED UNDER TITLE VII OR THE ADEA

To be covered under Title VII or the ADEA, an individual must be an employee - not an independent contractor. Neither Title VII nor the ADEA provides a cause of action for discrimination against an independent contractor. *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1495 n.13 (11th Cir. 1993). Therefore, because Plaintiff is an independent contractor of Thrivent, her employment discrimination claims must be dismissed. The applicable test was set out by the U.S. Supreme Court in *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318, 323-24 (1992), wherein the Court adopted the common law agency test for determining who qualifies as an "employee" under ERISA (which has the same definition of "employee" as Title VII and the ADEA), considering such factors as:

> 1) the skill required; 2) the source of the instrumentalities and tools; 3) location of the work; 4) duration of the relationship between the parties; 5) whether the hiring party has the right to assign additional projects to the hired party; 6) the extent of the hired party's discretion over when and how long to work; 7) the method of payment; 8) the hired party's role in hiring and paying assistants; 9) whether the work is part of the regular business of the hiring party; 10) whether the hiring party is in business; 11) the provision of employee benefits; and 12) the tax treatment of the hired party.  *Id.* at 323-24.

Plaintiff was clearly an independent contractor of Thrivent, as evidenced in part by the agreements between the parties explicitly stating that Plaintiff was an independent

contractor.[1] (Ex. 6, Pl. Dep. 1 ; Complaint, Ex. "B")[2]. Plaintiff testified she read the agreements before signing them, including the acknowledgement that she had "chosen the independent contractor relationship." (Pl. Dep. 1; p.199, l. 3-24; p.200, l. 1-12). Even under the pre-merger Lutheran Brotherhood District Representative Agreement wherein Plaintiff provided services from 2/14/2000 - 12/31/2002, Plaintiff was an independent contractor and acknowledged that she "has chosen this independent contractor relationship" in language mirroring the Thrivent agreements. (Ex. 5, Pl. Dep. 1).

As an independent contractor, Plaintiff had the right to determine the method, manner, time and place of performing her activities under the agreements. (Ex. 6, Pl. Dep. 1; Complaint, Ex. "B"). Plaintiff did not receive a salary, rather, was compensated through a commissions schedule. (Ex. 6, Pl. Dep. 1; Complaint, Ex. "B"). As an independent contractor, Plaintiff bore the risk of loss from her business if her commissions did not exceed her business expenses. As an independent contractor, Plaintiff was able to sell insurance products for other companies approved by Thrivent, and testified that she sought approval to sell non-Thrivent products, and received such approval through Thrivent's home office. (Pl. Dep. 1, p.207, l. 20-25).

Plaintiff's agreements with Thrivent provided that Plaintiff "shall pay and is responsible for all expenses incurred by [] her in the performance of [] her duties under

---

[1] Plaintiff provided services under these agreements from January 1, 2003 until the time her independent contractor relationship with Thrivent Financial and Thrivent Investment was terminated. The copy of Plaintiff's Financial Associate Agreement with Thrivent Financial attached to the Complaint as Exhibit "A" was missing the first page of the agreement, however, a complete copy of the agreement was appended to the plaintiff's deposition of September 24, 2004 (Pl. Dep. 1) as Exhibit 6.

[2] Plaintiff was deposed by Thrivent on two separate occasions. For ease of reference, the deposition of the Plaintiff held on September 24, 2004 will be referred to as "Pl. Dep. 1".

this Agreement." (Ex. 6, Pl. Dep. 1; Complaint, Ex. "B"). Plaintiff incurred her own business expenses, including business travel expenses, such as lodging, meals, and automobile expenses (insurance, gasoline, and maintenance) (Pl. Dep. 1 p.208, l. 14-25; p.209, l. 1); office expenses, including amounts for office space at 4026 27th Street Court West, Bradenton, FL 34205, and the expenses of furniture for that office space; office equipment, including leased computer equipment (Ex. 3, Pl. Dep. 1), and postage, copying, fax, and telephone costs. (Pl. Dep. 1 p.205, l. 10-18; p.209, l. 17-19). In a June 27, 2002 letter to Mr. Atwood, Plaintiff stated "I have planned with the amalgamation of AAL/LB to open a larger professional office to further create more sales. I have taken steps to hire personnel and have been working 12 to 14 hour days to be able to make this happen." (Ex. 8, Pl. Dep. 1). Plaintiff was free to hire, and did hire administrative and secretarial support services, at her own expense, including a clerical office assistant who updated the database Plaintiff used to track her business expenses, and an office professional paid to deliver brochures. (Ex. 32, 42, Pl. Dep. 1, p.126, l. 19-25; p.127, l. 1-25; p.128, l. 1-19). Plaintiff was also responsible for her own marketing expenses, including seminars and coffee hours (Pl. Dep. 1, p.206, l. 18-21; p.207, l. 3-7), and letters she sent several times a year to prospects; (Pl. Dep. 1, p.205, l. 10-18); for personal imprint materials, such as stationery and business cards, (Pl. Dep. 1, p.205, l. 22-25); professional liability coverage; licensing and designation fees, fees for additional training, and dues for professional and trade organizations. (Pl. Dep. 1, p.206, l. 3-12).

Plaintiff filed IRS Form 1040, Schedule C (Profit or Loss from Business (Sole Proprietorship)). Plaintiff testified that she filed her federal income taxes as a "statutory employee" and filed a Schedule C as a self-employed tax payer. Plaintiff testified that as a statutory employee, she was permitted and indeed did, take deductions against her self employment income for her business expenses. (Pl. Dep. 1, p.228, l. 1-17). Plaintiff was as an independent contractor under the common law rules as a full-time insurance sales agent and seller of investment and securities products. Plaintiff's commissions were not subject to federal income tax withholding. In her deposition, Plaintiff referred to herself as a "statutory employee" for federal income tax purposes. *Id.* Thrivent Financial is required by IRS regulations to treat full-time insurance sales agents as a "statutory employees" for purposes of social security withholding and determining eligibility for certain ERISA plans. Although the IRS deems full-time insurance sales agents as "statutory employees" for social security tax purposes, such designation does not make the individuals "employees" for purposes of Title VII and the ADEA. [3]

---

[3] The IRS regulations provide "If workers are independent contractors under the common law rules, such workers may nevertheless be treated as employees by statute ("statutory employees") for certain employment tax purposes if the worker is . . . A full-time insurance sales agent whose principal business activity is selling life insurance or annuity contracts, or both, primarily for one life insurance company: and if the workers meets all three of the following three conditions:  (1) the service contract states or implies that substantially all of the services are to be performed personally by them; (2) they do not have a substantial investment in the equipment and property used to perform the services (other than an investment in transportation facilities); and (3) the services are performed on a continuing basis for the same payer." See IRS Publication 15-A – 1. *Who are Employees ?  Statutory Employees.* Workers in certain specified occupational groups who do not meet the test of employee status under the common law control standard (such as Thrivent FAs) may still be statutory employees under IRC section 3121(d)(3) if they work in certain occupational groups, including Full Time Life Insurance Salespersons (such as Plaintiff). Also, except for full-time life insurance salespersons, statutory employees are not treated as employees when determining eligibility for employee benefit programs.  The wages of statutory employees may be subject to social security, Medicare, FUTA and SUTA taxes. They are not subject to income tax withholding.  *http://www.irs.gov/publications/p15a/ar02.html#d0e426)*

Courts have consistently held that insurance agents are not employees for purposes of employment discrimination suits. *Cahill v. State Farm Mutual*, 2001 WL 515926, FN2 (E.D. Pa. 2001)(citing *Barnhard v. New York Life Ins. Co.*, 141 F.3d 1310, 1313 (9th Cir. 1998)(citing cases)). As in *Barnhard*, an application of the common-law factors supports the conclusion that Plaintiff was an independent contractor of Thrivent, where, as here, the Plaintiff signed a contract containing clear language stating that she would act at all times as a self-employed independent contractor, and not as an employee. *Id.* at 1313. The federal courts have not equivocated on the issue of whether insurance agents are independent contractors or employees, and have consistently held that insurance agents are independent contractors not covered under the anti-discrimination laws. For example, in *EEOC v. Catholic Knights Insurance Society*, 915 F. Supp. 25, 31 (N.D. Ill 1996), the court held that the insurance agents there at issue were independent contractors, observing that "Plaintiffs have not cited one case where an insurance agent was found to be an employee." Similarly, in *Birchem v. Knights of Columbus,* 116 F. 3d 310, 313 (8th Cir. 1997), the court noted that "federal courts have consistently held that insurance agents are unprotected independent contractors, and Birchem has cited no contrary authority." Significantly, the insurance agents in *Catholic Knights* and *Knights of Columbus* were contracted with fraternal benefit societies, the same as Plaintiff in this case.[4] Accordingly, Thrivent asserts Plaintiff was an independent contractor and, thus,

---

[4] See also *Anyan v. New York Life*, 192 F.Supp.2d 228 (S.D.N.Y. 2002) (agent was properly classified as independent contractor within the meaning of anti-discrimination employment statutes where the agent signed agreements containing language similar to Thrivent's agreements, stating agent was an

not covered by Title VII or the ADEA, and therefore summary judgment is appropriate

on all of Plaintiff's claims brought under Title VII and the ADEA.

**V.      EVEN IF PLAINTIFF HAD BEEN AN "EMPLOYEE" RATHER THAN AN "INDEPENDENT CONTRACTOR," PLAINTIFF CANNOT SHOW THAT SHE SUFFERED DISCRIMINATION BASED UPON HER AGE OR GENDER, AND THEREFORE SUCH CLAIMS MUST FAIL.**

The genesis of Plaintiff's complaints of age and gender discrimination are

Plaintiff's complaints about sharing Manatee County with pre-merger AAL

representative Danford, and those complaints began shortly after the merger. Plaintiff

testified she allegedly experienced "job-related discrimination," which started in 2002

when Atwood brought an agent from another state (Danford) to share the same territory

(a common post-merger occurrence). (Ex. 28, 29, Pl. Dep. 1, p.33, l. 5-17; p.102, l. 14-

20). Plaintiff (a pre-merger LB representative) voiced her complaints in a June 27, 2002

letter to pre-merger general agent Ken Atwood, Plaintiff's new Thrivent managing

partner, responsible for the Florida regional financial office ("RFO"). Plaintiff believed

that after the merger of AAL and LB, she was the rightful heir to and should have been

assigned <u>all</u> of the members in Manatee County who held pre-merger AAL products, in

addition to <u>all</u> of the pre-merger LB members, which Plaintiff retained by virtue of her

being the only pre-merger LB representative in that area. (Ex. 8, Pl. Dep. 1). Plaintiff's

complaints continued in a July 11, 2002 E-mail to Fran Neben, Senior Partner, Florida

RFO (second in command to Atwood). The crux of Plaintiff's complaints was that

---

independent contractor; was not required to work from employer's offices, had complete discretion over his hours, controlled his own assistants, was not taxed as an employee, and was responsible for own expenses).

Plaintiff did not want an additional FA – whether the FA was male or female, or over or under age 40, brought into Manatee County. (Ex. 9, Pl. Dep. 1). In her July 19, 2002 letter to Atwood, Plaintiff complained she did not think it was "fair" to have to share "her territory" because "competition for new clients will be great." (Ex. 10, Pl. Dep. 1).  None of Plaintiff's complaints referenced her gender or her age.

Thrivent Divisional Vice-President Doug Ahrenstorff was asked by Atwood to address concerns related by Plaintiff regarding some of the "snafus" resulting from the merger of AAL and LB, and also to address Plaintiff's perception that as a pre-merger LB representative, she was being left out in the cold in what Plaintiff perceived as an "AAL takeover" in Florida. By email dated July 29, 2002, Ahrenstorff addressed Plaintiff's concerns point-by-point, and noted that Plaintiff told him in a recent telephone conversation that "you expected and felt you deserved to have those pre-merger AAL members assigned to you." Ahrenstorff sympathized with Plaintiff's protestations regarding having another FA move into Manatee County, and with Plaintiff's perception of an "AAL takeover" in Florida. (Ex.11, Pl. Dep. 1, p.82, l. 25, p.83, l. 1-17). Plaintiff's complaints continued to center on her disdain at having another FA moved in to "her territory" and her perception that as a pre-merger LB representative, she would not fare well in what she perceived to be an "AAL takeover" of Florida. Plaintiff's complaints had absolutely nothing to do with any allegations of discrimination against her based upon her age or gender. Ahrenstorff continued to respond to Plaintiff's complaints regarding processing errors and member assignment issues related to the merger. (Ex. 12, Pl. Dep. 1). In an August 5, 2002 letter to Ahrenstorff, Plaintiff for the first time raised

"discrimination" when she claimed that Ahrenstorff did not know the "discrimination I am facing." Plaintiff's perception of "discrimination" centered on her status as a pre-merger LB representative, Thrivent's enforcement of its policies regarding member assignments, and with intermittent processing errors which occurred as Thrivent merged the AAL and LB member databases and computer platforms. (Ex. 13 - 14, Pl. Dep. 1).

There were a multitude of customer contact issues to be addressed following the merger of the two former competitors, AAL and LB, and on August 16, 2002, Fran Neben, Senior Partner, sent an email to Plaintiff and other FAs outlining the relationship management guidelines established by the RFO to address those issues. (Ex. 15, Pl. Dep. 1, p.85, l. 18-25). Because of issues and conflicts specific to Plaintiff and Danford, Neben met with the two FAs to discuss and establish guidelines for marketing in their area, and Neben recounted agreements reached during that meeting (including an agreement regarding delivery of calendars to Beautiful Savior Church) in an email dated August 28, 2002. (Ex. 16, Pl. Dep. 1). Neben sent another, more general email on September 12, 2002, which Plaintiff also received, wherein Neben again addressed the customer contact procedures and relationship guidelines that the FAs were to follow. (Ex. 38, Pl. Dep. 1, p.109. l. 2-7). Plaintiff continued to exhibit problems following the customer contact and relationship management guidelines. Neben continued to devote special time and attention to customer contact issues and worked with Plaintiff and Danford to devise a plan to address those issues. (Ex. 39, Pl. Dep. 1; Neben Dep. p.61, l. 19-24). Plaintiff continued to resist the directive that pre-merger AAL accounts were to be serviced by pre-merger AAL representative Danford. (Ex. 41, Pl. Dep. 1).

On October 23, 2002, a telephone conference was held between Atwood, Neben, Plaintiff, and Jane Semrow, of Human Resources, wherein Plaintiff was verbally counseled on a number of behavioral issues related to customer contact issues. Notes from the conference were forwarded to Plaintiff as an attachment to an email dated November 12, 2002 from Neben. During the conference, Plaintiff was counseled for 1) violating the agreement regarding Danford's delivery of the calendars to Beautiful Savior Church; 2) a complaint received about Plaintiff's inappropriate behavior from an AAL branch officer at a church in Parrish, FL, and 3) complaints received from Appleton Papers about Plaintiff's inappropriate behavior and interactions with Appleton Papers human resources staff.[5]  (Ex. 17, Pl. Dep. 1, p.87, l. 1-21, p.88, l. 1-17).

Plaintiff alleges that she was discriminated against based upon her age and gender when business was allegedly directed away from her and assigned instead to Danford. (Complaint, ¶17,18,19). However, it is clear from Neben's email of November 24, 2002 that not only Plaintiff, but "All Florida Associates" (male/female and over/under age 40) were experiencing the same post-merger anxieties over perceived loss of members. (Ex. 43, Pl. Dep. 1, p.115, l. 17-25; p.116, l. 1-25). In 2003, Plaintiff's complaints regarding her perceived loss of members became increasingly demanding and accusatory. Thrivent management continued to respond with extra personal attention to Plaintiff's concerns, none of which even remotely resembled age or gender discrimination – but generally

_____

[5] Appleton Papers human resources assistant Vicki Mirsberger testified about her interactions with Plaintiff, and described Plaintiff's behavior as "overly aggressive in her behavior around this money," inappropriate, accusatory, and very out of the ordinary from dealings with other financial investment firms. "It made me very uncomfortable." It was disturbing to her and something that wasn't normal, so at that

involved member assignment issues resulting from human and technology challenges attributable to the merger. (Ex. 46, 47, 49; Pl. Dep. 1, p. 118, l. 17-25; p.119, l. 1-25; p.120, l. 1-15; p.121, l. 9-18). Plaintiff complained that Danford was taking away some of her clients, however, Neben testified that her complaints involved "joint households" that were being divided up between Plaintiff and Danford. Plaintiff also complained that churches were being taken away from her, however, Neben testified that such an allegation was absolutely not true. (Neben Dep. p.34, l. 1-24). Neben was in charge of "relationship management," and was in charge of working with all of the FAs as the merger came together. Neben testified that as with any merger, there were problems when you try to put two companies together who have always basically been their own – competitors with one another for a hundred years –there were "obviously some trials and tribulations." (Neben Dep. p.23, l. 25; p.24, l. 1-8). After the merger, in the Florida RFO, there were in many cases two, three, or even four FAs in a given area, partly because some of the FAs were pre-merger AAL and some were pre-merger LB representatives. The Florida RFO established "relationship management" guidelines and tried to work out a joint marketing arrangement between the FAs. (Neben, p.60, l. 23-25; p.61, l. 1-18; p.62, l. 1-25). Neben was assigned to be the intermediary between the associates if they needed to sort things out. (Neben Dep. p.23, l. 15-25). On February 4, 2003, Neben, in responding to yet another round of Plaintiff's complaints and accusations warned Plaintiff "[A]s I have addressed with you before ... your continued demands of the RFO

---

point she felt as though it was worthwhile to get her manager (John Rhodes) involved. (Mirsberger Dep. p.5, l. 16-20; p.8, l. 9-25; p.22, l. 10-25; p.25, l. 2-25, p.26, l. 1-3).

leadership and continued accusations of others are not conducive to good relationships and will not be tolerated." (Ex. 47, p.2, Pl. Dep. 1). Neben also testified about some of the customer complaints received about the Plaintiff, and recalled talking with a member who had requested that Plaintiff be removed from her account. The member stated that she was "scared of Lea" and the member "didn't want her [Plaintiff] calling her anymore." (Neben Dep. p.22, l. 5-18). Atwood testified that Thrivent received a lot of complaints about Plaintiff – "complaints from pastors, vicars, members that never wanted to see her again." (Atwood Dep. p.40, l. 10-25). Neben testified that all of the complaints Thrivent received about Plaintiff had to do with Plaintiff's interpersonal relations. (Neben Dep. p.23, l. 1-3).

On March 26, 2003, Plaintiff sent an email to Jane Semrow, asking for "the company guideline handbook for age and sex discrimination." (Ex. 1, Semrow Dep.). That same day, Plaintiff also emailed her request to Tim Wendt, also in Human Resources. On March 28, 2003, Wendt responded that the Thrivent policies were under development, and explained the discrimination complaint reporting procedure to Plaintiff. (Ex. 18, Pl. Dep. 1). On March 31, 2003, Plaintiff again emailed Wendt, this time seeking copies of the pre-merger policy handbooks. (Ex. 2, Semrow Dep.). On April 3, 2003, Plaintiff emailed both Wendt and Semrow, that "I am still waiting" for the pre-merger policy handbooks. (Ex. 3, Semrow Dep.). Both Wendt and Semrow declined to send copies of the pre-merger handbooks, and instead asked whether Plaintiff wanted to make a complaint, and tried to assist her. Semrow responded on April 3, and asked Plaintiff to please let her know when would be a good time to talk about Plaintiff's

request. (Ex. 20, Pl. Dep. 1). On April 7, 2003, Plaintiff emailed Thrivent in-house

counsel Eric Olson, again requesting copies of the <u>pre-merger</u> company handbooks. (Ex.

4, Semrow Dep.). On April 8, 2003, Semrow again emailed Plaintiff and stated she had

been trying to reach her and wanted to talk with her about her request. (Ex. 21, Pl. Dep.).

On April 9, 2003, Plaintiff again emailed attorney Olson about the <u>pre-merger</u>

handbooks, and stating "I want to read what is established policy.  I know you can

understand why I want to follow protocol." (Ex. 5, Semrow Dep.). On April 9, 2003,

Plaintiff also emailed a generic BOX email address at Thrivent, again requesting a copy

of the <u>pre-merger</u> policy handbooks. (Ex. 6, Semrow Dep.). On April 9, 2003, Semrow

had a telephone conference with Plaintiff wherein she explained to Plaintiff that the

written procedures for the <u>post-merger company</u> (Thrivent) had <u>not yet been completed</u>;

Semrow verbally outlined the reporting procedures to Plaintiff, and told Plaintiff that if

Plaintiff had experienced or witnessed harassment or had a complaint to report, Plaintiff

should report it to her. (Semrow Dep. p.35, l. 20-22; p.36, l.14-16; p.37, l.6-7, 13-14). At

no time during this series of requests and discussions did Plaintiff ever say to Semrow,

Wendt, attorney Olson, or anyone else at Thrivent that she had a discrimination

complaint she wished to report. (Ex. 1, Semrow Dep. p.38, l. 21-25; p.39, l-12). On April

11, 2003, Plaintiff wrote to Thrivent Senior Vice President James Thomsen, asking him

to investigate her claims of discrimination based upon age and gender. (Ex. 26, Pl. Dep.

1). The gist of Plaintiff's letter to Mr. Thomsen complaining of "discrimination" is a

recounting of the perceived "wrongs" she had experienced through the merger, and a

request that she be assigned additional members. All of her complaints, although cloaked

as age and gender discrimination, continued to center on the AAL and LB tensions, and

the issues and challenges related to the merger. On April 15, 2003, Plaintiff was provided

30 days notice by her managing partner, Ken Atwood, that her independent contractor

agreements with Thrivent would be terminated effective May 16, 2003, for "complaints

regarding interaction with customers and [Plaintiff's] failure to follow relationship

management and customer contact procedures despite repeated discussions with RFO

management." (Ex. 25, Pl. Dep. 1). As required by NASD, Thrivent Investment filed a

Form-U5 reporting Plaintiff's termination, listing the reason for termination as "failure to

follow firm policies, procedures, and instructions." (Ex. 7, p.3, Semrow Dep.). On April

17, 2003, Plaintiff filed a charge with the EEOC, alleging gender and age discrimination,

and retaliation, and that charge was dismissed. (Ex. 1, Pl. Dep. 1; Complaint, Ex. "F").

Even if she <u>were</u> an employee of Thrivent (which she was not), Plaintiff has not, and

cannot, establish a viable claim for either gender or age discrimination, or retaliation, and

so those claims must fail as a matter of law.

**VI.    PLAINTIFF CANNOT ESTABLISH DISPARATE TREATMENT
        GENDER DISCRIMINATION (TITLE VII) OR AGE DISCRIMINATION
        (ADEA), THEREFORE COUNTS I AND IV MUST FAIL.**

        Plaintiff alleges Atwood subjected her to disparate treatment based upon her

gender and age when he assigned Danford to the Manatee County territory and allegedly

directed business away from Plaintiff to Danford (Complaint, ¶17); harassed Plaintiff and

reprimanded her for engaging in certain sales practices and techniques, while not

reprimanding Danford for engaging in similar practices and techniques (Complaint, ¶49);

and terminated Plaintiff's independent contractor agreements.(Complaint, ¶¶20, 52).

To prove a prima facie case of age or gender discrimination, a plaintiff must prove that she was: a member of the protected class; qualified for the position; subjected to adverse employment action; and suffered from disparate treatment because of membership in the protected class. *See Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000). In order to prevail, Plaintiff must show that men, and other persons under the age of 40, were "treated considerably differently, and better." *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1253 (11th Cir. 1999). This Plaintiff cannot do. After the plaintiff proves her prima facie case, the defendant need only to produce evidence of a non-discriminatory reason for the challenged employment action. *See Chapman*, 229 F.3d at 1024-25. The employer's burden is merely one of production not persuasion. *Id.* at 1024. Once the defendant articulates one or more such reasons, the burden transfers to the plaintiff to proffer sufficient evidence that the defendant's articulated reasons are pretextual. *Id.* at 1025.  The presumption of discrimination is then rebutted and the employer is entitled to summary judgment unless the plaintiff proffers evidence sufficient to establish that discrimination was actually the reason for the challenged action.  *Id.* at 1024-25.

Even assuming that Plaintiff <u>could</u> establish a prima facie case of either gender or age discrimination (which clearly she cannot), Thrivent's documented evidence of her failure to follow customer contact and relationship management guidelines, and the repeated complaints received by Thrivent about her interactions with customers constitutes adequate non-discriminatory reason for her discharge. Moreover, Plaintiff was not reprimanded only by her male managing partner, Ken Atwood, but was also

reprimanded on several occasions by Fran Neben, a female senior partner who was older than Plaintiff.[6]

Thrivent has articulated legitimate, nondiscriminatory reasons for terminating Plaintiff – Plaintiff's failure to comply with customer contact procedures and relationship management guidelines. Plaintiff cannot rebut the Thrivent's nondiscriminatory reason by simply asserting that she did not fail to follow the customer contract procedures and relationship management guidelines. Plaintiff's conclusory statements are insufficient to defeat a motion for summary judgment. Moreover, courts have held that the real issue is the employer's belief at the time it made the decision to terminate. "Thus, the inquiry is limited to whether the employer believed the allegation in good faith and whether the decision to discharge the employee was based on that belief." *Waggoner v. City of Garland, Texas*, 987 F. 2d 1160, 1165-66 (5th Cir. 1993). Plaintiff cannot establish that Thrivent in good faith did not believe that Plaintiff failed to follow customer contact procedures and relationship management guidelines but instead relied on them as a bad faith pretext for discrimination. *Id.* at 1166. Plaintiff admitted in her deposition that she was admonished for violating relationship management guidelines and told that such behavior would not be tolerated. (Pl. Dep. 1, l. 18-22). Plaintiff cannot present sufficient evidence to contradict the non-discriminatory reasons proffered by Thrivent nor can she establish that a genuine issue of material fact exists that Thrivent's asserted reasons were a pretext to divert business away from her, reprimand her, and terminate her employment because she was a female over 40 years old.  For these reasons, summary judgment in

---

[6] Neben was 60 years old at her deposition taken on Sept. 29, 2004. (Neben Dep. P.27, l. 8-10).

favor of Thrivent is proper on Plaintiff's Title VII and ADEA claims. *Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000)(summary judgment entered against employee after he to failed produce sufficient evidence to create a genuine issue of pretext).

## VII.   PLAINTIFF CANNOT ESTABLISH HOSTILE WORK ENVIRONMENT GENDER DISCRIMINATION (TITLE VII), OR AGE DISCRIMINATION (ADEA), THEREFORE COUNTS II AND V MUST FAIL.

Neither Title VII nor the ADEA guarantees employees a stress-free working environment.  *Hipp v. Liberty National Life Ins. Co.*, 252 F.3d 1208, 1234 (11th Cir. 2001). To establish a hostile work environment claim, a plaintiff must show that the conduct in question is severe or pervasive. *Id.* at 1231. This circuit has consistently required pervasive conduct by employers before finding that a hostile work environment existed.  *See, e.g., Mendoza at 1247.* In the instant case, Plaintiff has not alleged any offensive comments or conduct that could possibly rise to the level of being "severe and pervasive" such as would constitute a hostile work environment based upon either gender or age.

Plaintiff alleges Atwood subjected her to a "hostile work environment" based upon her gender and age when he allegedly harassed and reprimanded her for engaging in sales practices and techniques that were within Thrivent's guidelines (Complaint, ¶¶30,31,49); and based upon her age, when he terminated her independent contractor agreements with Thrivent. (Complaint, ¶61). Plaintiff's complaints of "hostile work environment" have to do with Plaintiff's recalcitrance, and reprimands Plaintiff received for not following RFO guidelines and procedures. "Title VII does not protect an

employee from harsh criticism from her employer." *Portera v. State of Ala. Dept. of Finance*, 322 F.Supp.2d 1285, 1290 (M.D.Ala. 2004). Atwood's insistence that Plaintiff follow the rules and his verbal reprimands (and those of Fran Neben) when she did not are not particularly severe. Plaintiff contends that the reprimands contributed to a hostile and abusive environment. Even if Plaintiff is correct that she should not have been reprimanded for "engaging in sales practices and techniques that were within the guidelines and practices of Defendants," reprimands such as were received by Plaintiff is not the type of pervasive discriminatory conduct that Title VII is meant to prevent. *Id.* Plaintiff cannot establish that such reprimands constituted "severe and pervasive" conduct by Thrivent, and so her hostile work environment claims must fail.

## VIII. EVEN IF PLAINTIFF HAD BEEN AN EMPLOYEE, SHE CANNOT ESTABLISH RETALIATION UNDER TITLE VII OR THE ADEA, THEREFORE COUNTS III AND VI MUST FAIL.

To establish a claim for retaliation in violation of Title VII, a plaintiff must plead facts supporting a prima facie case that: she was engaged in a protected activity; the defendant took adverse employment action against her; and there is a causal relationship between the plaintiff's engagement in protected activity and the employer's adverse employment action. *Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999). Plaintiff appears to allege that she was engaged in protected activity when she inquired about Thrivent's harassment policies. (Complaint, ¶¶40, 68). To satisfy the first element of the prima facie case, Plaintiff must have engaged in activity that is protected under Title VII's retaliation provisions, which protect only conduct falling under either the opposition clause or the participation clause of the provisions. *EEOC v. Total Systems,*

*Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000). Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice" under Title VII. Under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII." *Id.* Plaintiff has not alleged that she is protected under either the participation clause or under the opposition clause of Title VII's retaliation provisions. Plaintiff appears to allege that she was engaged in protected activity when she inquired about Thrivent's discrimination policies. (Complaint, ¶¶40, 68). Such activity does not constitute "protected activity" under either the participation or the opposition clause of Title VII's retaliation provisions.

The participation clause protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC.  Plaintiff did not file her EEOC charge until April 17, 2004 – two days <u>after</u> she was informed by Atwood that her independent contractor agreements with Thrivent were being terminated. *Total Systems*, 221 F.3d at 1174 FN2. Requesting copies of policies is not protected activity under the participation clause. Nor is such activity protected under the opposition clause. Plaintiff requested copies of Thrivent's discrimination policies, but never said she had a discrimination complaint to register, and presented her request to Thrivent's in-house counsel as "I want to read what is established policy." At no time while requesting a copy of the policies did Plaintiff voice an objection to any alleged illegal conduct by Thrivent. Requesting copies of policies is not sufficient to constitute protected activity under the

opposition clause. In addition, to maintain a claim under the opposition clause, Plaintiff must have a good faith, objectively reasonable belief that her employer has engaged in unlawful discrimination." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999). The "objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law." *Id.* Although the conduct opposed need not "actually be [unlawful discrimination], ... it must be close enough to support an objectively reasonable belief that it is." *Id.* Plaintiff has not alleged a good faith, objectively reasonable belief that Thrivent engaged in unlawful discrimination under Title VII and/or the ADEA, nor would such a belief, if held, be objectively reasonable based upon these facts. Because requesting copies of company policies on discrimination is not "protected activity" under either the opposition clause or the participation clause of Title VII's retaliation provisions, Plaintiff's retaliation claims must fail. Alternatively, even if Plaintiff <u>were</u> an employee (which she was not), and even if she <u>could</u> establish a prima facie claim for retaliation (which clearly she cannot) Plaintiff cannot rebut Thrivent's nondiscriminatory reason for her termination – and so her retaliation claims must fail as a matter of law.

## IX. PLAINTIFF CANNOT ESTABLISH A CLAIM FOR PUNITIVE DAMAGES UNDER TITLE VII, THEREFORE HER CLAIM FOR PUNITIVE DAMAGES UNDER TITLE VII MUST FAIL.

"Punitive damages are disfavored by the law and are awarded solely to punish defendants and deter future wrongdoing." *Ferrill v. The Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir. 1999). Plaintiff cannot maintain a claim for punitive damages under Title VII because she cannot establish that Thrivent upper management acted with malice

or reckless indifference to the Plaintiff's federally protected rights. *See Kolstad v. American Dental Association,* 119 S. Ct. 2118, 2124 (1999). Malice means "an intent to harm" and recklessness means "serious disregard for the consequences of [one's] actions." *Splunge v. Shoney's, Inc.*, 97 F.3d 488, 491 (11th Cir. 1996). Plaintiff cannot show that Thrivent acted with the requisite malice or reckless indifference of Plaintiff's federally guaranteed rights to support an award of punitive damages. In the Eleventh Circuit, to recover punitive damages in a Title VII hostile work environment action, an aggrieved plaintiff must demonstrate some form of reckless or egregious conduct, such as: (1) a pattern of discrimination; (2) spite or malevolence; or (3) blatant disregard for civil obligations. *Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, 1322-23 (11th Cir. 1999). Punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Ferrill,* 168 F.3d at 476. Plaintiff cannot establish a basis to support an award of punitive damages, and so her claim must fail.

## X.   PLAINTIFF CANNOT ESTABLISH A CLAIM FOR PUNITIVE DAMAGES UNDER ADEA, THEREFORE THE CLAIM MUST FAIL.

It is well established in this Circuit that punitive damages are not recoverable under the ADEA. *Goldstein v. Manhattan Industries, Inc.*, 758 F.2d 1435, 1446 (11th Cir. 1985). Neither are damages for pain and suffering recoverable under the ADEA. *Dean v. American Security Ins. Co.*, 559 F.2d 1036, 1038 (5th Cir. 1977). Recovery under the ADEA is limited to lost wages and benefits. Compensatory damages for pain, suffering, emotional distress, or punitive damages, are not recoverable. Therefore, any and all of

Plaintiff's claims under the ADEA for punitive damages, for emotional distress or mental anguish, for personal humiliation or loss of self esteem, and any other claims for damages under the ADEA, other than statutorily permitted claims for lost wages and benefits, must fail.

**XI.   PLAINTIFF CANNOT ESTABLISH A CLAIM FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING UNDER FLORIDA LAW, THEREFORE COUNT VII MUST FAIL.**

On December 6, 2002, following the merger of AAL and LB, Plaintiff entered into agreements with Thrivent Financial and Thrivent Investment, effective January 1, 2003. Plaintiff alleges that Thrivent's termination of the agreements, just four and one half months after the agreements were executed, was a breach of the implied covenant of good faith and fair dealing. (Complaint, ¶¶ 75 – 76). The agreements specifically provide that they "may be terminated: (1) upon thirty (30) days' notice by either Party for any reason at any time, with or without cause, (2) upon notice by either Party at any time if the other Party has breached this Agreement and/or (3) by mutual consent of the Parties at any time." Florida courts have held unequivocally that the rights conferred by the implied covenant of good faith and fair dealing are limited, and have held that an action for breach of the implied covenant of good faith and fair dealing cannot be maintained in the absence of breach of an express contract provision. *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1316 (11th Cir. 1999) "With respect to [a] breach of an implied duty of good faith, a duty of good faith must relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract

requirements." *Id.*. "The implied obligation of good faith cannot be used to vary the terms of an express contract." *City of Riviera Beach v. John's Towing*, 691 So.2d 519, 521 (Fla. 4th DCA 1997). Furthermore, "[t]he Florida appeals courts have also refused to recognize the implied covenant as a viable cause of action in the at-will employment context." *Burger King at* 1310, FN3. Clearly, the agreements with Thrivent upon which the Plaintiff bases her claim for breach of implied covenant of good faith and fair dealing could be terminated at will by either party. Florida courts have consistently refused to recognize the implied covenant in such an "at will" context, therefore the Plaintiff's claim must fail. Moreover, since Plaintiff did not allege that Thrivent's actions violated <u>any</u> express provision of <u>either</u> agreement, her claim must fail as a matter of law.

## XII.   PLAINTIFF CANNOT ESTABLISH A CLAIM FOR DEFAMATION UNDER FLORIDA LAW, THEREFORE COUNT VIII MUST FAIL.

Thrivent Investment is a securities firm, and is a member of the National Association of Securities Dealers (the "NASD"). Plaintiff was a registered representative for Thrivent Investment. NASD rules mandate that a securities firm file a Form U-5 promptly upon the termination of any registered representative. "Whenever a registered [representative] leaves the firm's employ, NASD requires the stockbrokerage firm to file a Form U-5." *Eaton Vance Distrib. v. Ulrich,* 692 So.2d 915, 916 (Fla. 2d DCA 1996). The NASD requires firms within the securities industry (such as Thrivent Investment) to disclose the basis for the termination of employment of any registered representative on the Form U-5. On Plaintiff's Form U-5, Thrivent indicated the reason for the termination

as "failure to follow firm policies, procedures and instructions." (Complaint, Exhibit D).

Plaintiff alleges that the statement on the Form U-5 is false and defamatory.

Thrivent Investment can only be held liable for damages if the statements made in

Plaintiff's Form U-5 are defamatory. This Court must apply Florida substantive law to

the Plaintiff's defamation claim. *See Media Services Group, Inc. v. Bay Cities Commun.,*

*Inc.*, 237 F.3d 1326, 1329 (11th Cir. 2001). Under Florida law, the elements of a cause of

action for defamation are: (1) the defendant published a false statement (2) about the

plaintiff (3) to a third party and (4) the falsity of the statement caused injury to the

plaintiff. *Bass v. Rivera*, 826 So.2d 534, 535 (Fla. 2nd DCA 2002). Plaintiff was

repeatedly disciplined because of relationship management issues, and because of

customer complaints. Plaintiff's termination letter informed her that her independent

contractor agreements were being terminated for "complaints regarding interaction with

customers and [Plaintiff's] failure to follow relationship management and customer

contact procedures despite repeated discussions with RFO management." Plaintiff cannot

establish the first element of her prima facie case, that is, she cannot establish that the

statements in her Form U-5 are false, and so her defamation claim must fail.

Under Florida defamation law, certain occasions or circumstances may give rise

to a qualified privilege to make otherwise actionable defamatory remarks without

liability. As the Florida Supreme Court stated in the seminal case of *Abraham v. Baldwin*,

52 Fla. 151, 155, 42 So. 591, 592 (1906)

> "A communication, although it contains criminating matter, is privileged
> when made in good faith upon any subject in which the party
> communicating has an interest, or in reference to which he has a right or

duty, if made to a person having a corresponding interest, right or duty, and made upon an occasion to properly serve such right, interest or duty, and in a manner and under circumstances fairly warranted by the occasion and the duty, right or interest, and not so made as to unnecessarily or unduly injure another, or to show express malice. "

"One who publishes defamatory matter concerning another is not liable for the publication if (a) the matter is published upon an occasion that makes it conditionally privileged and (b) the privilege is not abused" *Nodar v. Galbreath*, 462 So.2d 803, 809 (Fla. 1984). Thrivent's Form U-5 statements to the NASD, even if otherwise actionable, were made upon a conditionally privileged occasion. Thrivent has a legal duty under NASD Rules to file a Form U-5 indicating the reason the firm has terminated its relationship with any registered representative, even Plaintiff.[7]

Whether slanderous words uttered are a privileged communication depends upon the circumstances under which they were uttered, and whether or not the facts and circumstances, when conceded, establish the privilege, is a question of law for the court. *Abraham,* 42 So. at 592. "Generally, whether a qualified privilege exist is a mixed question of law and fact subject to determination by the trier of fact." *Shafran v. Parrish*, 787 So.2d 177, 180 (Fla. 2d DCA 2001). However, where the facts surrounding the circumstances under which the allegedly defamatory statements were uttered is not in dispute, as in the case at bar, the question of privilege is a question of law, and is

---

[7] More specifically, Article VI, Section 3(a) of the NASD By-Laws states:

Following the termination of the association with a member of a person who is registered with it, such member shall promptly, but in no event later than thirty (30) calendar days after such termination, give written notice to the [NASD] on a form designated by the Board of Governors of the termination of such association . NASD Manual (CCH) ¶1153(a).

properly determined by the court. "In determining whether or not a communication is privileged, the nature of the subject, the right, duty, or interest of the parties in such subject, the time, place, and circumstances of the occasion, and the manner, character, and extent of the communication, should all be considered. When all these facts and circumstances are conceded, a court may decide whether a communication is a privileged one, so as to require the plaintiff to prove express malice." *Id.* The issue of whether this qualified privilege exists is not a jury question when the circumstances surrounding the communication are undisputed; the question should be decided by the court. *See Nodar* at 810. In the case at bar, the facts and circumstances under which the Form U-5 was filed with the NASD are not in dispute, and are conceded by both Plaintiff and Thrivent, therefore whether the qualified privilege has been established is a question of law for this Court, and is proper for summary judgment. (See Complaint, ¶80; Amended Answer, ¶80). Accordingly, this Court should find that the privilege exists as a matter of law. *Id.*

Once it is determined that a qualified privilege exists, the speaker can lose the privilege only based upon express malice. "In Florida, express malice sufficient to overcome the presumption of good faith exists where the primary motive for the statement is shown to be an intention to injure the plaintiff." *Bass* (citing *Thomas v. Tampa Bay Downs, Inc.*, 761 So.2d 401, 404 (Fla 2d DCA 2000). Here, there is no issue of fact as to Thrivent's motive in making the statements on the Form U-5 – Thrivent was required by law to make the report to the NASD. To overcome Thrivent's claim of qualified privilege in the Form U-5 statements, Plaintiff must show "express malice," that is, that Thrivent's primary purpose for making the statements in the Form U-5 was

Thrivent's intention to injure Plaintiff. *Nodar at 806.* (Fla. 1984). In other words, Plaintiff must show that Thrivent, in completing and filing the Form U-5 with the NASD, was motivated more by a desire to harm her than by a purpose to fulfill its legal duty under NASD Rules to file an accurate and complete Form U-5 following her termination.

Even viewing the evidence in the light most favorable to Plaintiff, Plaintiff has failed to present any record evidence that would create an issue of fact as to whether Thrivent was motivated more by a desire to harm the Plaintiff than by a purpose to fulfill its duty to report the information on the Form U-5. Only where a speaker, speaking upon a privileged occasion, is motivated more by a desire to harm the person defamed than by a purpose to protect the interest giving rise to the privilege, can it be said that there was express malice and the privilege destroyed." *Nodar at 811.* Therefore, Plaintiff's defamation claim must fail.

## XIII.   PLAINTIFF CANNOT ESTABLISH A CLAIM FOR INTENTIONAL INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS, THEREFORE COUNT IX MUST FAIL.

The elements of tortious interference with a business relationship are "(1) the existence of a business relationship (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 814 (Fla. 1995). "A protected business relationship need not be evidenced by an enforceable contract." *Id.* However, "the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights." *Georgetown Manor, Inc.* at 814. Here, Plaintiff

had no existing or prospective legal or contractual rights to the members she alleges

Atwood wrongfully reassigned to another representative. Plaintiff's claim is belied by her

own admission that she understood that Atwood had the authority to re-assign clients,

and also by the language in her independent contractor agreements with Thrivent that

explicitly reserved to Thrivent the right to reassign any "customers, clients, prospects and

sales areas." (Pl. Dep. 1, p.71, l. 20-22).  Accordingly, this claim must fail.

      WHEREFORE, Defendants move this Court for summary judgment on all counts

of Plaintiff's Complaint.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Sheri D. McWhorter
Sheri D. McWhorter  (FBN: 062049)
FOLEY & LARDNER LLP
100 Tampa Street, Suite 2700
Tampa, FL 33601
(813) 229-2300 – Telephone
(813) 221-4210 – Facsimile
Counsel for Defendants
THRIVENT FINANCIAL FOR
LUTHERANS, THRIVENT
INVESTMENT MANAGEMENT INC.,
AND KENNETH E. ATWOOD

</div>

<div style="text-align:center">

CERTIFICATE OF SERVICE

</div>

      I hereby certify that on February 3, 2005, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system which will send a

notice of electronic filing to the following: Elihu H. Berman elihu@gte.net; Bruce J.

Robbins robbinsbj@aol.com, innetwrk@aol.com.

<div style="margin-left:40%">

/s/ Sheri D. McWhorter
Attorney

</div>