# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**LEA SMITH-JOHNSON,**

      **Plaintiff,**

**v.**                             **Case No.  8:03-cv-2551-T-30EAJ**

**THRIVENT FINANCIAL FOR
LUTHERANS, et al.,**

      **Defendants.**

_____/

## ORDER

THIS CAUSE comes before the Court upon Defendants' Motion for Summary Judgment (Dkt. 95), Plaintiff's memorandum in opposition (Dkt. #125) and numerous supplemental responses filed by both parties (Dkt. ## 132, 137, 139, 142, 145).  Plaintiff charges Defendants Thrivent Financial for Lutherans and Thrivent Investment Management, Inc. (collectively "Thrivent")[1] with retaliation and discrimination based on her gender and age, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. ("Title VII") and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA").  Plaintiff also alleges Florida state law claims against Thrivent for breach of the implied covenant of good faith and fair dealing, and for defamation.  Plaintiff's claim against Defendant Atwood, her former "immediate supervisor" and Thrivent's "regional director"

---

[1] The two entities will be referred to collectively as Thrivent for convenience, since Thrivent Investment Management, Inc. is a wholly-owned subsidary of Thrivent Financial for Lutherans.

during all relevant periods, is for intentional interference with advantageous business relationships.

Defendants argue that they are entitled to summary judgment on all of Plaintiff's claims. A hearing was held on Defendants' Motion on June 8, 2005. For the reasons outlined below, this Court finds that Defendants' Motion should be GRANTED.

## I. Background

In 1999, Plaintiff entered into an agreement with the Lutheran Brotherhood Society (the "Society") to act as a district representative selling insurance and other financial products to Lutherans, their families, and their communities in the area of Manatee County, Florida. Plaintiff's contract with the Brotherhood identified her as an "independent contractor" and stated that she was entitled to "exercise . . . her own judgment as to the time, place, and manner of soliciting insurance, servicing members and contract members, and otherwise carrying out the provisions of this Agreement."

Plaintiff worked out of her home office during her work for the Society, and her sales efforts were comprised principally of sending letters to potential prospects and current clients, holding seminars, and hosting coffee hours at local Lutheran churches. Plaintiff worked in this capacity until the Society merged with its competitor, the Aid Association for Lutherans (the "Association"), to become Thrivent.

On December 6, 2002, Plaintiff and Thrivent executed a "Financial Associate Agreement" and a "Registered Representative Agreement" (collectively "Agreements"), whereby Plaintiff became a "self-employed independent contractor" selling insurance and

securities on Thrivent's behalf.  The terms of the Agreements relating to Plaintiff's status as an independent contractor were almost identical to the terms in Plaintiff's previous agreement with the Society.   Part I, section A of the Financial Associate Agreement gave Plaintiff "full control of . . . her daily activities, with the right to exercise independent judgment as to the time, place, and manner of soliciting insurance, servicing contract members, and otherwise carrying out . . . her duties under [the] Agreement." It also indicated that Plaintiff had "chosen this independent contractor relationship, with its opportunities for financial reward and personal satisfaction, in preference to one which would place . . . her in an employee status."  Farther into this section, it was noted that the agreement did "not make [Plaintiff] an employee of [Thrivent Financial] or of a managing partner."[2]

Plaintiff's operations as a financial associate and registered representative for Thrivent were similar to her work as a district representative for the Society, although she no longer held financial product seminars for the Lutheran community and eventually began sharing her sales territory with another Thrivent financial associate. Once Thrivent moved this other financial associate into the Manatee County sales territory with Plaintiff, Plaintiff also was required to coordinate her sales efforts with those of the other financial associate.

Plaintiff did not sell financial products for any other company during her work for Thrivent, although she applied for and received Thrivent's approval to sell non-Thrivent products in accordance with the Agreements.  While working for Thrivent, Plaintiff was

---

[2] The Registered Representative Agreement contained nearly identical terms to the terms of the Financial Associate Agreement referenced herein.

responsible for the routine business expenses she incurred.  These business expenses included costs for office supplies, business cards, letters to prospective and current clients, traveling to and from church and client meetings, employing support staff, and holding coffee hours.  Plaintiff was not responsible, however, for the expenses she incurred when traveling for and attending mandated training sessions and company meetings, the cost of computer software used to illustrate Thrivent's financial products, and for calendars that Thrivent's financial associates used in their sales efforts.

Plaintiff did not receive a salary, paid sick-leave, or vacation time as a Thrivent financial associate.  Instead, she set her own work schedule and was compensated for her sales productivity by commissions and sales incentives.  Plaintiff did receive other non-compensatory benefits from Thrivent, however, including participation in its group disability, life insurance, health insurance, pension, and 401(k) plans. When Plaintiff received commission payments from Thrivent, Social Security and federal unemployment tax was withheld, pursuant to federal income tax rules governing full-time insurance agents, but federal income tax was not withheld.  Plaintiff paid her own federal income taxes and deducted the business expenses she incurred from her commission income on Schedule C to IRS Form 1040.

In a letter dated April 15, 2003, Plaintiff was notified by Defendant Atwood that she was being terminated as a financial associate and registered representative of Thrivent. Defendant Atwood's letter indicated that the termination was effective May 16, 2003, in accordance with the thirty-day notice provision of the Agreements.  The stated reason for

Plaintiff's termination was her "failure to follow relationship management and customer contact procedures despite repeated discussions with . . . management."

Soon after informing Plaintiff of her termination, Thrivent submitted a completed "Form U-5" with the National Association of Securities Dealers ("NASD"), a trade association in which Thrivent is a member, informing the NASD that it had terminated Plaintiff as a "registered" individual.  The instructions to the Form U-5 instruct the NASD member to "provide an explanation" for discharge of a registered individual who is "fully terminated."  Thrivent stated that Plaintiff was discharged for her "failure to follow firm policies, procedures, and instructions."

Plaintiff filed this action after receiving her right-to-sue letter from the Equal Employment Opportunity Commission dated August 18, 2003.

## II.  Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file" designate specific facts showing there is a genuine issue for trial.  Celotex, 477 U.S. at 324.

In determining whether the moving party has met its burden of establishing that no genuine issue of a material fact exists and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in a light most favorable to the non-movant, in this case the Plaintiff, and resolve all reasonable doubts in that party's favor. Samples on behalf of Samples v. City of Atlanta, 846 F. 2d 1328 (11th Cir. 1988). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (*emphasis added*).

### III.  Legal Analysis

### A.  Title VII and ADEA

Defendants contend they are entitled to summary judgment on Plaintiff's claims of retaliation and discrimination under Title VII and the ADEA because Plaintiff worked for Thrivent as an independent contractor rather than an employee. The protections afforded by Title VII and the ADEA extend only to the employment relationship and not to independent contractors. See e.g., Cobb v. Sun Papers, Inc., 673 F.2d 337 (11th Cir. 1982) (Title VII); Garcia v. Copenhaver, Bell, & Assoc., M.D.'s, P.A., 104 F.3d 1256 (11th Cir. 1997) (ADEA). A person's employment status "is a question of federal law to be ascertained through consideration of the statutory language of the Act, its legislative history, existing federal case law, and the particular circumstances of the case at hand." Cobb, 673 F2d. at 339 (*internal citations and quotations omitted*); Cuddeback v. Florida Bd. of Educ., 381 F.3d

1230 (11th Cir. 2004) (affirming district court's summary judgment finding that plaintiff was an employee under Title VII).

Title VII and the ADEA offer little guidance on the distinction between an employee and an independent contractor. Both statutes define "employee" as "an individual employed by an employer." 42 U.S.C. § 2000e(f); 29 U.S.C. § 630(f). Because there is "no indication that Congress intended the words of the statute[s] to have anything but their ordinary meaning as commonly understood," the term "employee . . . is to be construed in light of general common law concepts" taking into account the "economic realities of the relationship." Cobb, 673 F.2d at 340-341.[3] This so-called "hybrid economic realities test" demands that "the common law principles of agency and the right of the employer to control the employee" be used to determine the employee's status. Id. at 341. Among the common law factors that are to be considered in conducting this analysis are (I) the intention of the parties; (ii) the skill required in the particular occupation; (iii) the party furnishing the equipment used and the place of work; (iv) the method of payment, whether by time or by the job; (v) the type of employee benefits provided; (vi) the manner in which the work relationship is terminated; (vii) the importance of the work performed as a part of the business of the employer; and (viii) the manner in which taxes on income are paid. See id.

---

[3] Although the Eleventh Circuit in Cobb articulated this standard in the context of a Title VII discrimination claim, the analysis applies equally in the ADEA context. See Garcia, 104 F.3d at 1265 (noting that "Title VII and the ADEA's definitions of employee are virtually identical," and relying on the standard and facts of Title VII cases to determine a persons employment status under an ADEA case); Fountain v. Metcalf, Zima & Co., P.A., 925 F.2d 1398, 1400-1401 (11th Cir. 1991) (applying the test set forth in the Title VII case Calderon v. Martin County, 639 F.2d 271 (5th Cir. 1981) to determine the plaintiff's employment status under the ADEA).

In assessing the amount of control an employer exercises over the employee's work duties, courts look not only to the results that are to be achieved, but the "manner and means by which the work is accomplished." <u>Daughtrey v. Honeywell</u>, 3 F.3d 1488, 1496 (11th Cir. 1993).

Although there are aspects of the parties' relationship that are consistent with an employer-employee relationship under the common law and control factors, the weight of the evidence supports Defendant's contention that Plaintiff operated as an independent contractor for Thrivent.  First, both parties clearly intended for Plaintiff to operate as an independent contractor.  The terms of the Agreements stated in unambiguous terms that Plaintiff was to operate as an independent contractor with "full control" over her sales efforts, and that she chose this arrangement in light of the "opportunities for financial reward and personal satisfaction."  This employment arrangement was virtually identical to Plaintiff's former employment status with the Society.  Plaintiff, therefore, clearly understood the costs and benefits of the independent contractor relationship and demonstrated her intent to work in this capacity when she entered into the Agreements.  Plaintiff's understanding of her employment status was also demonstrated after the Agreements were signed when she treated herself as an independent contractor for federal tax purposes by filing her business expenses on Schedule C to IRS Form 1040.[4]

---

[4] Under federal tax laws, independent contractors report their business expenses on Schedule C, while employees use Schedule A to report their business expenses.  <u>See</u> <u>generally</u>, Internal Revenue Service Publication 1779 (Rev. 12-99).

Second, the sale of insurance and other financial products is a highly specialized and heavily regulated field.  Plaintiff had to study and pass multiple exams, obtain licenses to sell these products, and comply with various federal and state laws before she could operate as a financial associate and registered representative.  The highly specialized nature of Plaintiff's position is indicative of an independent contractor rather than an employee.

Third, Plaintiff was primarily responsible for the costs she incurred as a financial associate for Thrivent.  Although Thrivent supplied Plaintiff with computer software and financial calendars that she used in her sales efforts, as well as an employee i.d. and password she used to gain access to Thrivent's computer database, Plaintiff paid for all of the other expenses associated with her work.  These costs included maintaining an office in her home, office supplies, business cards, letterhead, traveling, support staff, professional licenses and the expenses associated with the coffee hours she held for current and prospective clients.

Plaintiff argues that the computer Thrivent "furnished" to her and that had to be returned to Thrivent at the end of the employment relationship is further evidence of her employee status.  This evidence does not support Plaintiff's position, however, because she leased the computer from Thrivent and such an arrangement is inapposite to an employee-employer relationship, and is more akin to the independent contractor relationship set forth in the Agreements.

Fourth, the parties' financial arrangement also supports a finding that Plaintiff was an independent contractor.  Plaintiff was compensated by commission and sales incentives rather than being paid a salary with a guaranteed, but fixed level of income, thereby placing

the financial risks and benefits of the position on Plaintiff.  Plaintiff also did not receive an

employee benefits package typical to what an employee would receive.  Although Plaintiff

was entitled to participation in Defendants' group disability, life insurance, health insurance,

pension, and 401(k) plans, she was not entitled to sick leave, vacation time, or any sort of

annual leave that employees normally receive.

Fifth, Plaintiff was entitled to and given thirty-days notice before she could be

terminated, rather than being subject to Florida's at-will employment laws.  Sixth, the

payment of taxes on Plaintiff's income was consistent with the independent contractor

relationship set forth in the Agreements.[5]  Under federal tax laws, employers must withhold

federal income tax from their employees wages, but not for payments made to independent

contractors.  See generally Internal Revenue Service Publication 15, Circular E, Employer's

Tax Guide, Part 2, p.7 (January 2005); Internal Revenue Service Publication 15-A,

Employer's Supplemental Tax Guide, Part 1, p. 4-5 (January 2005).  Thrivent treated

Plaintiff as an independent contractor by not withholding federal income tax from her

commission checks.  More importantly, Plaintiff treated herself as an independent contractor

_____

[5] Plaintiff contends that the manner in which Thrivent treated her for federal tax purposes
supports her claim that she was an employee.  Although it appears that Thrivent withheld federal
unemployment and Social Security tax from her paychecks, it withheld such payments in accordance
with mandatory federal tax rules governing full-time insurance agents.  These rules require insurance
companies to withhold Social Security, medicare, and federal unemployment tax from their agent's
paychecks, regardless of whether the agent is an employee or independent contractor under federal
common law rules.  See generally Internal Revenue Service Publication 15, Circular E, Employer's
Tax Guide, Part 2, p.7-8 (January 2005); Internal Revenue Service Publication 15-A, Employer's
Supplemental Tax Guide, Part 1, p. 4-5 (January 2005).  Thrivent's adherence to these guidelines,
therefore, does not support Plaintiff's argument that she was an employee.

for federal tax purposes by deducting her business expenses on Schedule C to IRS Form 1040, allowing her to receive the full benefit of these deductions without being subject to the limitations that apply to employees.[6]

Finally, the means and method by which Plaintiff operated supports Defendant's contention that she was an independent contractor. Plaintiff worked as a financial associate and registered employee with a substantial degree of independence and autonomy uncharacteristic of an employee. Plaintiff worked out of her own home, deciding how many days each week to work and how many hours each day to work. She exercised complete autonomy over and responsibility for the hiring and supervising of subordinates, and she determined how much of her income to allocate to personal consumption and how much to allocate to her business operations. Moreover, Plaintiff was able to sell products on behalf of other companies, albeit with the condition that her primary efforts be exercised on behalf of Thrivent and the limitation that Plaintiff forward her order forms to Thrivent for submission to these other companies. All of these facts are inconsistent with an employee-employer relationship.

Plaintiff's work for Thrivent undoubtedly was an integral part of the company's business, and this factor weighs in favor of an employer-employee relationship. In addition,

---

[6] Taxpayers classified as employees may deduct business expenses only if they itemize their deductions, and these deductions are subject to a reduction equal to two percent of the taxpayer's adjusted gross income. Independent contractors, on the other hand, do not have their deductions reduced by this amount. See generally, Internal Revenue Service Publication 1779 (Rev. 12-99).

her position with Thrivent was not truly independent, for she could be disciplined for selling another company's products without Thrivent's consent, and she was required to attend certain company meetings and training sessions.  Thrivent also exercised an increasing amount of control over Plaintiff's operations once she began sharing her sales territory with the other financial associate.  This control was exercised through "relationship management guidelines" that Thrivent developed for all of its financial associates  serving overlapping sales territories, and "marketing guidelines" Thrivent established specifically for Plaintiff and her fellow financial associate.

The relationship management guidelines prevented financial associates from soliciting business from clients who already were working with another Thrivent associate and from holding themselves out as the only Thrivent associate serving the area.  The marketing guidelines regulated the churches where Plaintiff delivered financial calendars; how Plaintiff and her fellow associate conducted targeted marketing to individuals, mass marketing, and financial seminars; and required Plaintiff and her fellow financial associate to share their lists of existing clients so that marketing letters would not be sent to persons who already were represented.

These relationship management and marketing guidelines can not be easily dismissed because they interfered with Plaintiff's right to control the manner and means by which she operated, and they appear to constitute the reasons given by Defendants for termination of the Agreements.  A company's policies requiring coordination among its independent contractors and preventing them from soliciting each other's clients or misleading

prospective clients, however, are not antithetical to an independent contractor relationship. When considered along with all of the other common law factors and the considerable control Plaintiff had over her daily operations, these guidelines fail to convert Plaintiff into an employee for purposes of Title VII and the ADEA. The parties intentions, actions, and overall arrangement are entirely consistent with the independent contractor relationship set forth in the Agreements, not an employee-employer relationship. Accordingly, Defendant is entitled to summary judgment on Plaintiff's Title VII and ADEA claims.[7]

## B.  Implied Covenant of Good Faith

Defendants argue that Plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails because an express contract provision of the Agreements was not breached. This Court agrees.

Plaintiff's claim for breach of the implied covenant of good faith is based on Defendant's decision to terminate the Agreements after only four and a half months of its execution.  See Plaintiff's Second Amended Complaint, ¶¶74-78 (Dkt. #14).[8]  The Agreements granted both parties the right of termination "for any reason at any time, with or without cause."  Under Florida law, a claim for breach of the implied covenant of good

---

[7]  Defendants alternatively argued that summary judgment on Plaintiff's discrimination claims should be awarded even if she is an "employee" because Plaintiff failed to demonstrate that she was discriminated or retaliated against based on her age and gender.  Defendants' alternative argument is not addressed in light of the finding that Plaintiff worked as an independent contractor.

[8]  Plaintiff advanced a new claim of breach of the implied covenant of good faith in her amended response to Defendants' Motion (Dkt. #132).  Plaintiff failed to assert this claim in any of her three complaints, and she is foreclosed from raising such a claim in an opposition brief to a motion for summary judgment, particularly at this late stage of the proceedings.  See e.g., Gilmour v. Gates, McDonalds, and Co., 382 F.3d 1312 (11th Cir. 2004).

faith can not be maintained "in the absence of the breach of an express contract provision." Burger King Corp. v. C.R. Weaver, 169 F.3d 1310, 1316 (11th Cir. 1999).   Because Defendant's termination decision was consistent with the express terms of the Agreements, Plaintiff's claim is without merit.   Defendant, therefore, is entitled to summary judgment on this claim.

### C.  Defamation

Plaintiff's defamation claim arises out of the "Form U-5" Defendant submitted to the NASD, indicating that Plaintiff was terminated because she failed to follow firm "policies, procedures, and instructions."   Defendants contend that they are entitled to summary judgment because their statement on the Form U-5 was privileged and Plaintiff failed to demonstrate that they acted with "express malice" when completing the form.   Plaintiffs do not dispute that Defendants' statement on the Form U-5 was subject to a qualified privilege. Plaintiff's contention is that Defendant's actions were motivated by the need to create a non-discriminatory reason for her termination,[9] and that the language was used "knowing and regardless of the fact that it would injure the Plaintiff."

---

[9]  Plaintiff also asserts in a rather inconsistent manner that Defendants' principal motive in completing the Form U-5 was to injure her.  This argument, however, relies on the erroneous assumption that Defendant was not obligated to state a reason for her termination.  Article VI, Section 3(a) of the NASD by-laws state that a member must give written notice of a registered person's termination on a form designated by the Board of Governors, and the instructions to Form U-5 explicitly state that the reason for the termination must be given.  See By-Laws of the National Association of Securities Dealers, Article V, Sec. 3(a); Instructions to Form U-5, Part 3 (Dkt. #143, Attach. 1).

This Court agrees with Defendant that it is entitled to summary judgment on the defamation claim.  Under Florida law, a "presumption of good faith" attaches to a statement made in accordance with a qualified privilege, and the burden rests with the plaintiff to prove that the statement was made with "express malice."  Nodar v. Galbreath, 462 So.2d 803, 810 (Fla. 1984).  This burden requires a plaintiff to prove that "the primary motive for the statement is shown to have been an intention to injure the plaintiff."  Id. at 806 (citation omitted).  Express malice can be proven by reference to the "language itself, or . . . by extrinsic circumstances."  Id. at 810, n.12.

Plaintiff's contention that Defendants' true motivation was to disguise the discriminatory basis for its termination decision fails to overcome the good faith presumption of Defendants' statement.  Assuming *arguendo* that Plaintiff's contention is true, Defendants' statement on the Form U-5 was not in fact motivated by an intent to injure the Plaintiff, but rather to conceal their own wrongdoing.  Moreover, knowledge or belief that one's statement will likely have an incidental and injurious effect on another is not sufficient under Florida state law to constitute defamation. See id. at 812 ("[t]he incidental gratification of personal feelings of indignation is not sufficient to defeat the privilege where the primary motivation is within the scope of the privilege"); Boehm v. American Bankers Ins. Group, Inc., 557 So.2d 91, 94 (Fla. 3rd DCA 1990) ("[i]t is insufficient that the speaker have generalized feelings of hostility and malice towards the Plaintiff" because "[o]nly if the Plaintiff demonstrates that the primary motivation for the statements uttered was express malice is the privilege overcome").

Defendants' words by themselves do not rise to the level of express malice. Cf. Loeb v. Geronemus, 66 So.2d 241, 243 (Fla. 1953) (stating that plaintiff should be expelled from a religious organization because he was a bad example for children, guilty of evil conduct, of low moral character, a disgrace, a troublemaker, and not respectable); Brown v. Fawcett Publications, Inc., 196 So.2d 465 (Fla. 2d DCA 1967) (claiming plaintiff was a murderer, rapist, and sodomite). The circumstances surrounding their statement demonstrate either Defendants were merely complying with their obligation under the NASD rules, or were attempting to conceal the discriminatory reasons for Plaintiff's termination. In either case, Defendant was not motivated by a malicious intent to injure the Plaintiff when it completed the form. Accordingly, Defendants are entitled to summary judgment on Plaintiff's defamation claim.

## D.  Interference with Business Relationships

Plaintiff's claim of intentional interference with a business relationship is based on Defendant Atwood's alleged re-assignment of some of the clients Plaintiff served to her fellow financial associate and Defendant Atwood's refusal to respond to and comply with requests by her clients to continue working with Plaintiff.[10] Defendant Atwood argues that

---

[10]  Although it is not entirely clear from Plaintiff's Second Amended Complaint and other filings, Plaintiff also appears to argue that she developed a business relationship with all Lutherans in her sales territory, not just the clients she serviced. To the extent Plaintiff asserts a claim of intentional interference with respect to the remaining Lutherans in her sales territory, her claim fails because "no cause of action exists for tortious interference with a business's relationship to the community at large." See Ethan Allen, Inc., v. Georgetown Manor, Inc., 647 So.2d 812, 815 (Fla. 1995).

he is entitled to summary judgment because Plaintiff had no legal or contractual rights to the business accounts with which Defendant Atwood allegedly interfered.  This Court agrees.

Under Florida law, the elements of intentional interference with a business relationship are: (I) the existence of a business relationship; (ii) the defendant's knowledge of the business relationship; (iii) intentional and unjustified interference with the business relationship; (iv) by a third party; and (v) damages caused by the interference.  <u>Ethan Allen, Inc., v. Georgetown Manor, Inc.</u>, 647 So.2d 812, 814 (Fla. 1995).

Plaintiff's claim fails because she has not demonstrated "an existing or prospective legal or contractual right" to business with any of the clients she serviced.  <u>Id</u>.  The clients Plaintiff serviced had not and were not entering into contracts with Plaintiff for insurance coverage or the purchase of financial securities.  Rather, these persons were purchasing financial products from Thrivent.  Moreover, the express provisions of the Agreements stated that Thrivent had the authority to reassign any "members, customers, clients, prospects and sales areas" in accordance with its policies.  Plaintiff has not cited to a single case in support of her claim that an independent contractor who works on behalf of a company is afforded a legal or contractual right to a business relationship with the company's clients.  Accordingly, Defendant Atwood is entitled to summary judgment on Plaintiff's intentional interference claim.

## IV.  Conclusion

For the reasons stated herein, this Court finds that Defendants are entitled to summary judgment on all of Plaintiffs' claims.  It is therefore ORDERED AND ADJUDGED that:

1.      Defendants' Motion for Summary Judgment (Dkt. 95) is **GRANTED**.

2.      The Clerk is directed to award summary final judgment in favor of Defendants,

close this case, and terminate all pending motions as moot.

**DONE** and **ORDERED** in Tampa, Florida on July 20, 2005.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Odd\2003\03-cv-2551 Motn Summ Judgment ADEA, Title VII.wpd